Trumbull v. Union Trust Co.

LYMAN TRUMBULL ET AL

v.

UNION TRUST COMPANY ET AL.

*Insolvency—Wool Factors—Assignment by Less than Full Number of Members of Firm—Subsequent Ratification by the Rest—Receiver—Possession of—Warehousemen—Loans upon Receipts of—Attorney's Fees—Evidence—Costs—Confusion.*

1.   An assignment should not be made by less than the full number of the members of a given firm in the absence of the rest and without their authority, unless a crisis has arrived in its affairs, and the absent partners can not be consulted personally or otherwise, in time to meet or avoid the same.

2.   Subsequent ratification by such absent partners does not operate to divest the rights of purchasers and lien holders acquired in good faith after the execution of the first instrument, and before such ratification.

3. The admixture by a factor of certain grades of wool belonging to different consignors, without keeping account of the property of the different shippers, amounts to confusion, and in proceedings involving the same, the owners must be made whole beyond all doubt.

4. The practice of factors to issue what purport to be warehouse receipts covering their own property upon their own premises, does not constitute them warehousemen, nor does such receipt furnish greater protection to its holder than would an unacknowledged chattel mortgage.

5. Upon an appeal from an order of the County Court touching the matter of the insolvency of a firm of wool factors this court holds, with reference to the claim for first lien · by the Union Trust Company, upon certain wool, that the same can not be maintained in view of the fact that the amount of money claimed to have been advanced by it thereon and unpaid at the time of the hearing in said court is purely conjectural and incapable of being shown; that the assignment by two of three partners composing the insolvent firm was inoperative to pass title to the property involved until the same was ratified by the absent partner, his whereabouts not having been shown when the same was made, and that the interest of the two partners did not pass till then; that the taking possession by a storage company of lofts leased by it from said insolvents by a ruse after the receiver of said firm had taken possession thereof, and before such ratification, can not be complained of; that such action sufficed to make its title complete against the assignors, assignee and general creditors to the extent of the advances of its receipt holders which remained unpaid, and that certain receipt holders had no better standing as against the consignors of certain wool than the factors would have themselves.

[Opinion filed June 4, 1889.]

APPEAL from the County Court of Cook County; the Hon. R. PRENDERGAST, Judge, presiding.

This is an appeal from an order of the County Court of Cook County in the matter of T. W. Hall & Co., insolvent debtors. The firm of T. W. Hall & Co., composed of Thomas W., Charles and William P. Hall, were merchants and factors in wool, having their office and warehouse in two connected buildings, known as numbers 46 to 52 Dearborn avenue, Chicago. They occasionally purchased wool on their own account, but generally their business was that of factors. The firm was a customer of, and kept a general deposit account with the Union Trust Company, a banking institution in Chicago. In June, 1877, an agreement was made between the firm and said bank for advances by the latter on wool to be consigned

to the firm. S. W. Rawson, president of and a witness for the bank, testified that the bank was to have a lease of the second floor of the Halls' warehouse, and that it would pay the drafts against the wool, which was to be placed on said second floor. The trust company was to be considered the owner of the wool to the extent of the advances, and when it was sold, the indebtedness was to be paid; but it never had possession of any part of Hall & Co.'s warehouse, or any part of the wool. When a draft arrived, Hall & Co. would draw their check for the amount, procure a certification thereof by the trust company, and use the same to pay the draft, which was then taken, with the bill of lading for the wool attached thereto, and both delivered to the trust company. Policies of insurance on this wool were taken by Hall & Co. in their firm name, loss, if any, made payable to the trust company, and the policies delivered to the latter. The drafts, bills of lading and policies remained in possession of the trust company until the hearing in the County Court. For the amount of such advances Hall & Co. gave their notes to the trust company from time to time, as the advances were made, the amounts of the notes always being for a somewhat larger amount than the draft. No advances were made by the trust company under this agreement after August, 1887. A separate account of the advances was not kept, but they were blended with the general account of Hall & Co.; the payments made by Hall & Co. were made on the general account, and in renewing the loans the notes for the advances on the wool were kept separate from those given on the general account. The total amount of advances made on wool in 1887 was sworn by Rawson to be $28,000 on wool consigned by Ayers & Fell, and about $60,000 on other wool, called Montana. He also testified that out of the total amount of advances, Hall & Co. owed the trust company at the time of the hearing, $22,665, of which the sum of $3,165 was for an overdraft. At times, on renewal of a note, the trust company loaned to Hall & Co. more money than the amount of the note taken up. In 1887, the bank advanced to Hall & Co. $80,000, in addition to the advances on the wool.

The trust company claims a first lien on all the Ayers & Fell wool which came to the hands of the assignee of T. W. Hall & Co., or its proceeds, to the extent of said advances thereon, which (it is alleged) remain unpaid to the amount of $19,500.

In June, 1887, Hall & Co., by two written instruments, leased to the National Storage Company the third floor of their warehouse for one year, the entire rent being $5. The conditions of the lease were as follows :

*First.* That said leased premises shall be used and occupied exclusively for the storage of goods, chattels and personal property.

*Second.* Said party of the second part, or its agent or agents, shall be permitted easy and convenient passage, at any and all times, through any part of the abutting premises that is or shall be occupied or controlled by said parties of the first part, for the purpose of convenient access to the premises herein leased.

*Third.* It is further agreed that this lease may be canceled, and the said premises leased herein be surrendered to said first party, whenever all the storage warrants given by said second party to the said first parties shall have been taken up and canceled by said second party.

In January, 1888, they made another lease to the storage company, of the second floor of the warehouse, at the same rental, the above conditions being inserted in the instrument, and another to the effect that Hall & Co. might have the use of such portion of the premises as should not be occupied by the lessees.

In June, 1888, two other leases were executed by Hall & Co. to the storage company for the second and third floors of the warehouse, for a term of one year, the rental specified in each being $5. The National Storage Company had no permanent warehouse. Its method of business was to take a lease of premises near the persons desiring to have business relations with it, usually leasing a part of said person's premises. Such leased premises are designed to be during the term of such lease, the warehouse of such company. Pos-

session of them, as it claims, is taken either by placing such premises under its lock and key, or by placing thereon signs indicating its rights and possession. The company's warehouse receipts are then issued upon the property placed upon such premises, and its possession thereof and supervision of the goods placed therein, are alleged to be maintained by the constant presence of a custodian, or by the daily visits of one of its inspectors.

Its warehouses were designated by numbers, that at 46 to 52 Dearborn avenue being numbered 18. After the relation of lessor and lessee was thus created, Hall & Co. made written applications to the storage company in which was stated that the appellants had placed upon premises leased to the storage company a certain amount of wool belonging to the applicants, and requesting a warehouse receipt therefor. In response to such application, receipts were issued by the storage company, acknowledging the receipt of the wool and undertaking to deliver the same to the order of T. W. Hall & Co. at its warehouse No. 18, at the premises described in the leases, upon the payment of storage and charges, and the surrender of the receipts properly indorsed.

Hall & Co. borrowed of the several parties named below, the amounts, and at the dates set opposite their respective names: Lyman Trumbull, $10,000, December 30, 1887; Commercial National Bank, $17,500, April 21 and 25, 1888; Ira Tomblin, $10,000, April 14, 1888; Illinois Trust & Savings Bank, $27,000 in the fall of 1887; Union National Bank, $19,000, May 17, 1888; Metropolitan National Bank, $3,000, June 13, 1888.

To secure these loans warehouse receipts, in substance as above set forth, properly indorsed, were delivered to the several lenders by Hall & Co. On June 1, 1888, all the outstanding receipts were called in by the storage company and others for like amounts issued. At the time of the hearing in the County Court there was due on the several debts last above specified, more than $50,000, in the aggregate, for which the only security was the said warehouse receipts held by the creditors, which called for more wool than was in the warehouse at the time of the assignment.

In July, August, September, 1887, and May, 1888, William Parberry, Henry Kertz, Grande Brothers, Patterson Brothers and Lieneman & Schmidt, severally shipped to Hall & Co. as factors, certain quantities of wool, parts of which were not accounted for by Hall & Co. up to the time of their assignment. That belonging to Parberry and Kertz was mixed with other wool of the same kind, and they claimed that they were entitled to receive the quantities which had not been accounted for out of any wool of that kind which came into the hands of the assignee. That belonging to Grande Brothers was sent out of their warehouse by the Halls and stored elsewhere, and its identity was lost. Other wool was substituted by the party controlling the latter warehouse, and was received by Hall & Co. as and for the Grande Brothers' wool. The wool of Patterson Brothers and Lieneman & Schmidt which was not sold by Hall & Co., was received by the assignee. Part of the wool which was in Hall & Co.'s warehouse at the time of the assignment was claimed by the Lincoln National Bank, and part thereof by Henry F. Vehmeyer, on receipts issued by T. W. Hall & Co., as collateral security, each receipt acknowledging that a certain quantity of wool had been received, subject to the order of the party to whom the receipt was issued, on the surrender of the receipt. In these receipts, signed by T. W. Hall & Co., it was stated that the property was storage and insurance free.

In the summer of 1888, Thomas W. Hall left Chicago and went west to some point not named by any witness, on business of his firm. Afterward, on July 19th, his partners executed and delivered to John Kinsey, as assignee, an instrument purporting to be a voluntary assignment of the firm of T. W. Hall & Co. Kinsey at once took exclusive possession of the entire warehouse above described, including the second and third floors and all their contents. On the next day, by a ruse, the storage company managed to place one of its agents in actual possession of the second and third floors, and the wool there stored. A dispute as to the possession of those two floors and their contents thereupon arose between the assignee and the storage company, which, by arrangement between

them, resulted in an order by the County Court on July 23d, directing assignee to hold possession until the rights of all parties could be determined, and without prejudice to either, and ordering the storage company to yield possession to the assignee.

On July 21st, Thomas W. Hall ratified and confirmed the assignment to Kinsey. The assignee, by direction of the County Court, sold all the wool which came to his hands, the proceeds thereof being $51,739.93.

By consent of parties, the claims were all submitted to the court for trial together. Out of the amount so received by the assignee as the proceeds of said wool, the County Court ordered that he appropriate $5,353.37 in payment of his charges, expenses and attorney's fees included in the litigation and in the administration of his trust. The remainder was ordered to be divided and paid as follows: to the Union Trust Co., $9,523.22; Patterson Bros., $5,012.35; Lieneman & Schmidt, $6,092.11; Grande Brothers, $2,011.64; William Parberry, $2,268.32; Henry Kertz, $857.01; National Storage Company for the benefit of its receipt holders, $20,561.01. The Lincoln National Bank and Vehmeyer were denied all right as secured creditors.

From that order Lyman Trumbull, Commercial National Bank, Ira Tomblin, Illinois Trust and Savings Bank, Union National Bank, Metropolitan National Bank and National Storage Company appeal. Appellees have assigned cross-error denying appellant's right to participate in the proceeds of the sale of the wool.

Mr. HENRY S. ROBBINS and CHARLES L. BROOKE, for appellants.

The facts found by the final order as the basis of the allowance of the claim of the Union Trust Company are that by contract with T. W. Hall & Co. the trust company was to furnish the money needed to pay advances to be made by T. W. Hall & Co., to persons consigning wool to them on the wool so consigned, and was to have a lien on the wool on which such advances were made for the money so advanced by it; that said wool should be held by T. W. Hall & Co. for the

benefit of said trust company as security for the money so advanced by it, and the proceeds thereof applied to such advances; that under this arrangement the trust company furnished $18,507.04 to T. W. Hall & Co., who advanced the same to Ayers & Fell upon a large amount of wool consigned by them T. W. Hall & Co.; that all the Ayers & Fell wool which came to the hands of the assignee was received under the agreement and is subject to this lien, and, as it consisted of only 68,530 lbs., the proceeds of which were only $9,523.22, this sum was awarded to the trust company.

The correctness of this part of the order is contested on two grounds:

1. That under the law and evidence no such lien is established.

2. If established, that it must be postponed to the rights of appellants.

There are three ways of making personal property security for a debt: by a pledge, by a mortgage and by an equitable lien. A pledge this was not, because possession (which is essential) did not pass. It also lacks all the elements of a mortgage. If anything, it is an equitable lien. We are not disposed to deny that the facts found in the decree would establish such a lien, but insist that these facts are not supported by the evidence when considered in connection with the law governing such liens. To such a lien there must be in existence, not only when it is created, but when also it is sought to be enforced, a *res* susceptible of clear identification to which it can attach.

In Jones on Liens, Sec. 34, the author says: "It is essential to an equitable lien that the property to be charged should be capable of identification, so that the claimant of the lien may say, with a reasonable degree of certainty, what property it is that is subject to his lien." * * * "It is necessary that the property or funds upon which the lien is claimed should be distinctly traced, so that the very thing which is subject to the special charge may be proceeded against in an equitable action, and sold under a decree, to satisfy the charge. A fund is not thus traced when it has

gone into the general bank account of the recipient, or after it has been mixed with other funds from other sources."

Person v. Obertuffer, 59 Howard's Practice, 339, is a case exactly in point. The insolvents were silk manufacturers. Plaintiffs had with them an agreement whereby plaintiffs were to furnish raw material, the goods when manufactured to be delivered to plaintiffs, and by them sold, and their advances paid out of the proceeds. Insolvents made a general assignment under which the assignee, among other property, obtained nineteen pieces of silk, both finished and unfinished. This suit was by plaintiffs to enforce an equitable lien upon such silk.

There was, as in the case at bar, "a running agreement between the parties thereto involving settlement of demands, supplies, sales and settlements of advances and material." The court said : " All the cases point to one conclusion : that the identical property or its proceeds must be traced in order to uphold the lien. In this particular the evidence offered on the part of plaintiffs fails to substantiate their claim to the equitable relief which they seek."

The case of Drake v. Taylor, 6 Blatchford, 14, was a bill to enforce an equitable lien against the proceeds of some property. The court denied the relief, saying: " The money having been mixed and confounded with other money, and neither it nor any substitution for it being shown to be capable of ascertainment or identification, or to be in existence anywhere, the right of the plaintiff to follow the money, and to claim a lien upon anything in respect to it, is gone." See, also, Fletcher v. Morey, 2 Story, 555; Grinnell v. Syndam, 3 Sandf. (N. Y.) 134.

It is equally essential to the enforcement of such a lien that, at the time it is sought to be enforced, the debt it secures should be susceptible of ascertainment as to the amount, and should not be so included in other indebtedness as to render it impossible to tell how much is secured by the lien and how much is not. In both these necessary conditions the trust company failed to support its claim by the evidence, the burden of proof, of course, being upon it.

Assuming the lien to have been established, it is, in its character, inferior to the rights of the appellants. As already stated, it is but an equitable lien, a mere equitable right or equity, which can be enforced only by a suit in equity or proceeding that partakes of that character. The trust company's answer or cross-petition was, in effect, a bill in equity to enforce this lien. It sought to establish no right recognized by the law, and could not have been asserted by any legal action. Because the parties intended that particular property should be set aside for, and applied to, the payment of the money advanced by the trust company, equity gives effect to that intention by declaring that the trust company shall have a right in or to the particular property, and sustains a proceeding to appropriate it to the payment of that debt. This is an equitable lien. T. W. Hall & Co., by delivering the warehouse receipts of the storage company to the appellants, also agreed that this same property should be specially applied to the payment of the money which the appellants, upon the faith of that promise, advanced to the Halls. Here, then, if nothing more was shown, is an equitable lien, established with equal clearness, in favor of these appellants. So, too, T. W. Hall & Co., by taking from the storage company its receipts upon this property, and negotiating them with the appellants, with equal clearness agreed that this property might be held by the storage company to protect it against the liability which they imposed upon it by negotiating these receipts. Here, too, is an equitable lien, if nothing more is established. Which, then, of these equitable liens is entitled to priority? If nothing else exists affecting it, we concede that the lien of the trust company, being prior in point of time, will prevail over the others. Upon two equitable principles this order is disturbed, and priority is given to appellants.

1. "Between a legal and equitable title to the same subject-matter, the legal title in general prevails in pursuance of the maxim, 'where there is an equal equity, the law must prevail.'" 2 Pomeroy's Equity Jurisprudence, Sec. 862.

While the right of the trust company is but an equitable one, the right of the appellants is more than this. It is one

that can be enforced in a court of law, through an action of
replevin.   In other words, it is a legal right, and will prevail
when in conflict with this mere equitable one.   Much of this
bulky record is due to evidence taken to establish or disprove
that the possession of the storage company during the term of
this lease was sufficiently evidenced and maintained by its
conduct, and the signs it placed there to be effectual as against
third parties, such as purchasers and judgment creditors.
While not satisfied with the result of the lower court's con-
clusions from this evidence we do not deem it essential in the
present state of this record to ask the reconsideration by this
court of this part of the case.   That court correctly held that
the assignee stood in the shoes of, and occupied no better
position than the insolvents—a principle so well established in
this State, that we presume it will not be questioned here.
This involved the further principle that an estoppel good
against the insolvents, will prevail against their assignee.   As
said in Kelley v. Scott, 49 N. Y. 602.

"Shawhan (insolvent) being estopped from denying the
rights of attaching creditors, his assignees are also estopped.
They have no other or superior rights to him, and they are
vested with the property subject to all equities against it in
his hands."

In I. R. R. I. & St. L. R. R. v. McCay, 3 B. R. 50 (1 Lowell,
345), the same principle is announced as against an assignee in
bankruptcy.   Also, Allen v. Whitemore, 14 B. R. 189 ; Sharp
v. Philadelphia Warehouse Co., 14 Phil. 419.

T. W. Hall & Co., by presenting and indorsing to the
several appellants (other than the storage company) warehouse
receipts which recited that the property had been received by
the storage company, and would be delivered by it to the
order of insolvents, in effect stated to the several appellants
that the wool was in the possession of the storage company,
and not in their own possession.   These appellants, not know-
ing the contrary to be the fact, but relying upon this statement,
loaned their money to the insolvents, and they would not now
be permitted to assert that the possession of the wool was not,
at the time of the assignment, in the storage company.   Their

assignee is bound by the same estoppel. The same would be true even as respects the storage company.

"Agreement upon a fact as the basis of a contract between parties is binding upon them after the contract has been executed, estopping each party from taking any position to the detriment of the other, inconsistent with the fact." Bigelow on Estoppel, 4th Ed., 655; Heger v. Chicago R. R. Co., 68 Wis. 100; McCance v. L. & N. W. R. R., 3 H. & C. 344.

"Though a contract be in fact held invalid, still * * * if it be acted upon afterward by the parties to it as valid, they will, if *sui juris*, be estopped from asserting its invalidity." Bigelow on Estoppel, p. 657; Branch v. Jessop, 106 U. S. 468; Reed v. Peterson, 91 Ill. 291.

The property in controversy belonged to the firm, composed of Thomas W., Charles and William P. Hall. On the 19th day of July, Charles and William P. executed and filed a deed of assignment purporting to convey to John Kinsey, as assignee, the property of the firm. On the 21st of July, by a separate paper, which was also filed, Thomas W. Hall joined in this paper. Until then the assignment was not valid as to this and other firm property. The subsequent ratification by Thomas W. did not relate back to the 19th, so as to cut off the rights which the appellants had acquired between the execution of the assignment by two of the partners and its ratification by the third. Holland v. Great, 29 Ohio St. 443.

In that case there was an assignment by one of two partners, then an attachment upon the firm property, and, subsequent to this, a ratification of the assignment by the other partner. The court said : "The power to make it (an assignment for creditors) is not within the contemplation of an ordinary partnership contract. * * * We think the safer and juster rule is, to require the assent of all the partners, either actually given or to be fairly implied from the situation of the parties or from the manner of conducting the business of the firm." And, speaking of the subsequent ratification, said: "It is equally well settled, however, that it can not have effect so as to defeat the rights of third persons *bona fide* acquired in the meantime." The attachment was adjudged superior to the assignment.

Coleman v. Darling, 66 Wis. 158, is a case similar to the last one in its facts and in the principles announced.    Wetter v. Schlieter, 15 How. Pr. 269, S. C., 4th Ed., Smith, 714.

One of the three partners of a firm doing business in New York City, in May went to Europe temporarily to solicit consignments, etc.    While so occupied, and on November 9th, he received a letter from his partners, calling him home. On that day he replied by letter that he would return, which was received the first of December.    December 5th the other two partners executed a general assignment.    December 14th the absent partner reached home.    Held, the two partners had no power to make the assignment.    Hook v. Stone, 34 Mo. 329.

In the spring, one of two partners went to California, and acquired a domicile there; in July following, the firm being insolvent, and this partner being absent in California, the other partner, in Missouri, executed a general assignment. Held, invalid.    See, also, Dunklin v. Kimball, 50 Ala. 215; Stein v. La Dow, 13 Minn. 413.

Messrs. TENNEY, BASHFORD & TENNEY, W. S. JOHNSON, JAMES FRAKE, H. H. MARTIN and COLLIER & WALKER, for appellees.

Mr. FARLIN Q. BALL, for John Kinsey, assignee.

In this class of cases the County Court sits as a court of chancery, with power to take all necessary or proper orders in the cause.    It is custodian of all the assets, and the trustee (through the assignee) of all the creditors of these insolvents. It distributes such assets among the claimants, as their rights, either legal or equitable, or both, shall appear after it has investigated them, and such an investigation is a duty which devolves upon the County Court.

That investigation is carried on by the help of the attorney of the assignee ; and the assignee, during such time, is subject to the order and control of the court, and must hold the goods to await the order of the court.

The County Court, like any other chancery court, may place the costs of the proceedings upon such parties herein

and upon such fund herein as, in the opinion of the chancellor, is equitable.

Such has always been the practice of courts of chancery.

As trustee of the general creditors and an officer of the court, it is the duty of the assignee, and of his attorney, to attend upon the court while such investigation is in progress and to assist the court in finding out what claims are valid and what are invalid. That duty carries with it the obligation to pay both the assignee and his attorney a reasonable sum for such services. To refuse to do so is the studied avoidance of a just obligation.

All the costs, expenses and reasonable solicitor's fees expended and incurred in this case by the assignee, were incurred by the order of the court and were necessary to enable the assignee to safely dispose of the assets in his hands; and therefore such costs, expenses and fees should be borne ratably by the several parts into which such assets have been divided by the court.

The assignee had *actual* possession of these assets. That must be admitted by everybody. The court, through him, had also such actual possession, and by virtue of its jurisdiction had the legal possession of such assets. Conflicting parties claimed such assets. It thereupon became the duty of the court to decide upon each of such claims. This he could do only by making the assignee a party and requiring him to aid in sifting such claims. The court therefore ordered the assignee to file the petition herein and to attend this trial. He, being a layman, was necessarily compelled to employ counsel. These facts were known from the beginning to all the claimants. The entire assets have been distributed among such claimants, and now the question comes up as to how those costs, expenses and fees shall be paid.

No case can be found in the courts of this State where the assignee in insolvency has been refused the fees of his counsel as well as his *per diem* or compensation and costs. The equity and justice of such an allowance is patent, and beyond dispute. In Blow v. Gage, 44 Ill. 209, such allowances were made. As to the moneys expended by the assignee and as to his services

in caring for these wools from the date of the assignment until they were finally sold, there can be no question. The assets had to be cared for by some one and that care must be paid for.

The intent of the statute is to place the entire distribution of the estate in the County Court, free from the interference of other courts. " Indeed, to permit such interference would practically defeat the chief object of the statute, namely, to provide a convenient, expeditious and inexpensive tribunal, through the instrumentality of which an insolvent debtor may make an entirely equitable distribution of his effects among his creditors. If, after the jurisdiction of the County Court has attached, third parties having real or pretended claims to or upon the trust estate were permitted by means of process issued out of other courts to take possession of the property in the hands of the assignee, for the purposes of litigation in such other courts, the County Court, by this means, might be deprived of its jurisdiction altogether. * * * To give the statute practical effect in all the provisions, we feel constrained to hold, as we do, that upon the making, filing and recording of the assignment, with the lists and schedules annexed, the County Court wherein such assignment is filed and recorded, in its character as an insolvent debtor's court, by operation of law, at once acquires jurisdiction over, and becomes possessed of all the property and estate embraced within the assignment, subject, of course, to all prior liens and just claims that third parties may have to or upon it." Hanchett v. Waterbury, 115 Ill. 227.

It can not be questioned that, under our statute in relation to voluntary assignments for the benefit of creditors, the County Court is invested with exclusive jurisdiction to control, administer upon and distribute the trust estate, and to control the assignee in the discharge of his duties. Freydendall v. Baldwin, 113 Ill. 325; Hanchett v. Waterbury, 115 Ill. 220; Colburn v. Shay, 17 Ill. App. 280; Preston v. Spaulding, 18 Ill. 134.

This, however, does not result from any express words of the statute conferring the jurisdiction on the County Court,

# 334    APPELLATE COURTS OF ILLINOIS.

and prohibiting the other courts from exercising it, but is only an application of the familiar and long-established rule that, in cases of concurrent jurisdiction, the court which first obtains it will have precedence. By the execution and recording of the assignment, the County Court obtains jurisdiction of the estate vested in the assignee by the assignment, and from that time its jurisdiction must have precedence over that of other courts. Boyden v. Frank, 20 Ill. App. 176.

The jurisdiction of county courts in cases of voluntary assignments for the benefit of creditors is a special statutory jurisdiction, and proceedings in that court, in the exercise of that jurisdiction, though incapable of being enumerated in any proper sense, as proceedings either at law or in chancery, are, in all their essential characteristics, much more nearly analogous to the latter than the former. Such proceedings are very similar in their main features to those adopted by courts of chancery in administering upon estates or property through the agency of receivers. The petition in this case is a mere summary application to a court exercising this statutory and *quasi* equitable jurisdiction, to release from its control, and hand over to the petitioner, certain property which its assignee claims to hold under the assignment, but which the petitioner claims belonged to him, and so did not pass by the assignment to the assignee. Traver v. Rogers, 16 Ill. App. 374; Colby v. O'Donnell, 17 Ill. App. 474; Messinger v. Yager, 16 Ill. App. 260.

Our statute in regard to costs does not profess to repeal any rule of the courts of equity relating to costs.

"It was never the intention of the Legislature to compel a trustee to carry on litigation in defense, or for the enforcement of the rights of the person or estate represented, out of his own pocket. Such a rule would put an end to all trusts, for want of persons to accept the burdens and responsibilities of them. No man would take upon himself the care of the estates of others, knowing that he must bear the expenses of litigation without indemnity.

"I entertain no doubt but that it is still in the power of courts having equity jurisdiction to allow to trustees and

Trumbull v. Union Trust Co.

others suing or defending in *autre droit* such reasonable counsel fees and disbursements, in addition to the costs given by the code, as they may deem sufficient to indemnify them against loss." Rose v. Rose, 28 N. Y. 184. (The New York statute in regard to costs is much more elaborate than is ours.)

Chancellor Walworth, in the teeth of the rule in the State of New York that the trustee is entitled to no compensation for his services, considering the justice of the claim, extended the statute giving compensation to executors, etc., to the case of an assignee in insolvency and gave him the same commissions and his expenses. Meacham v. Sternes, 9 Paige, 398.

The same conclusion was reached after surmounting the same legal difficulties by Chancellor Taylor in a case of a trustee appointed by a deed of trust, he saying that it was inconsistent with natural justice to ask for the services of a trustee and then to refuse to pay him a reasonable compensation therefor. Miller v. Beverley, 4 Hen. & Munf. 415.

" Voluntary assignees are not entitled to charge a commission as such, unless they have taken care to secure to themselves the right by express reservation or agreement; although in many cases, I have no doubt, with a view to compensation upon the ground of *quantum meruit*, the court would do right to adopt, by analogy, the same rate of commissions which guardians, executors and administrators are authorized by law to charge for similar services." Jewett v. Woodward, 1 Edw. Ch. 199.

Where the assignment was void " the trustees have the right as against the plaintiffs (creditors) to deduct from the amount in their hands the expenses of keeping, taking care of and selling the property, as well as a reasonable compensation for their services." Bishop v. Trustees, 28 Vt. 71.

" The costs, charges, expenses and disbursements attending the execution of the trust (an assignment) are not specifically enumerated (in the deed). The law allows such charges upon the fund, but requires them to be reasonable. They are

always subject to be reviewed by a court of equity; and although the deed had not contained such a provision, the law would have authorized the retention of all such reasonable charges." Blow v. Gage, 44 Ill. 213–214.

An executor is entitled to a credit in his account for fees paid to counsel for their professional services in establishing the validity of the will, and the bequests therein contained, where the legatees entitled to the estate are the parties in interest. Scott's Est., 9 Watts & S. (Pa.) 98.

The allowance to executors in proper cases of a reasonab'e counsel fee, is general. Morton v. Barrett, 22 Me. 257; Bendall v. Bendall, 24 Ala. 275; Copehart v. Huey, 1 Hill Eq. 405; Day v. Day, 2 Green's Ch. 549; Atcheson v. Robertson, 4 Rich. Eq. 39; Hester v. Hester, 3 Ind. Eq. 9.

"It is also the settled doctrine that executors and other trustees who have acted fairly, or who have resisted a claim in good faith merely by way of submission, shall have their costs out of the fund." Rogers v. Ross, 4 John. Ch. 608.

No prudent person would undertake the duty of a trustee, a *prochein ami*, or a relator to an information in behalf of a charity, in all which cases the proper execution of his duty might make it necessary for him to incur expenses which could not strictly come under the head of costs, if the court-when satisfied of the correctness of those charges, could not order them to be reimbursed under the head of just allowances. Fearns v. Young, 10 Vesey, 184.

"Nor shall we interfere with the order in regard to costs. "The accountant was a 'good trustee' says the auditor. *    *    * Nobody will serve as trustee if liable to be "harassed at every step about such small things." Graves' Appeal, 50 Pa. St. 193.

"The defendant, as administrator in an amicable suit concerning the will of his deceased, was allowed his taxable costs out of part of the estate.

"As the defendant is not in default, and has only sought the direction of this court in a case proper for it, he ought to receive costs out of the fund; and this is the course of the court in such cases." Morrell v. Dickey, 1 John. Ch. 156.

Trumbull v. Union Trust Co.

GARNETT, P. J.   From the statement of facts it is clear that the amount of money advanced by the Union Trust Company upon wool shipped by Ayers & Fell, and which was still unpaid at the time of the hearing in the County Court, is purely conjectural.   It is admitted that the entire account of Hall & Co. with the trust company was at all times kept as one individual account.   The various payments on, and renewals of all the Hall & Co. paper, made after the last advance on that wool, appear to have hopelessly destroyed all traces of the identity of those advances.   No effort was made to prove that the payments were not properly applicable to these specific items in the absence of directions by the debtors to apply them differently.   No special application by the trust company of such payments is shown.   No fact or circumstance in proof furnishes a foundation for any presumption in favor of the trust company's contention that a specific amount of the remaining debt of Hall & Co. represents part of the advances on the Ayers & Fell wool.   The trust company affirmatively asserts that at the date of the assignment, Hall & Company owed it a certain sum of money, which by agreement was made a lien on certain wool in the warehouse of the debtors.   To maintain that allegation the burden of proof was on the party making it.   It was necessary to prove, not only that Hall & Co. were in debt to the trust company, but that the debt proved, or some specific part of it, was *the* debt which the debtor had agreed to secure by lien on the wool.   Changes in the form of the debt would not affect the security, but the payments made may have extinguished the liability in question.   It certainly appears from the evidence that payments were made in amounts sufficient to satisfy all the advances on the Ayers & Fell wool. If these payments should be applied to other items in the account, the claimant should have proved the facts requiring that application.   It is unnecessary to enter into a critical analysis on other points of the evidence offered in support of the claim of the Union Trust Company, as the most liberal inferences warranted by the proof do not justify the finding of a lien in its favor.   The court erred in awarding to it a

better standing than that of the general creditor without security.

A serious question is presented as to the authority of the two partners to make the assignment without the third joining in, or authorizing its execution, yet we think the current of authority and the better reasoning establish the rule that an assignment of that character can not be made in the absence of the other partner and without his authority, unless a crisis has arrived in the affairs of the firm, and the absent partner can not be consulted, personally or otherwise, in time to avoid or meet the threatening emergency. If these conditions exist, authority from the absent partner to make the assignment is implied. Ratification by the absent partner does not operate to divest the rights of purchasers and lien holders, acquired in good faith after the execution of the first instrument, and before the ratification. 1 Bates on Partnership, Secs. 338, 339; Stein v. La Dow, 13 Minn. 412 (381); Holland v. Drake, 29 Ohio St. 441; Coleman v. Darling, 66 Wis. 155; Hook v. Stone, 34 Mo. 329.

The case in hand is not within the exception. Thomas W. Hall on July 19, 1888, was absent from Cook county; where he was, is not proved. For aught that appears, he could have been personally interviewed by another member of the firm within an hour's ride of Chicago. If not, he may have been accessible, at a more distant point by telegraph or telephone. If he was in Montana, as stated by counsel, there is no reason to believe he could not be reached by wire. At all events, the record is barren of evidence as to his whereabouts when the supposed assignment was executed, and the instrument was inoperative to pass title until it was ratified by him on July 21st. To the suggestion that the interest of the two partners executing, if nothing more, passed to Kinsey, the reply is simple. That was not their intention, or the intention of the assignee in accepting the supposed trust, nor could they in that manner terminate the partnership. The law absolutely denies the power of two out of three partners to assign under these circumstances, and is not so inconsistent as to permit an act to be done indirectly when it refuses to

allow it to be done directly.   If this conclusion is correct, there was nothing to prevent the storage company from taking possession on July 20th of the premises of which it held leases, and the wool there stored.   We are unable to see that it makes any difference that it contrived to take possession by deceiving Kinsey.   Stearns v. Sampson, 29 Me. 568.   At that time he had no right as against the storage company. Although the evidence is convincing that its so-called possession prior to July 20th was a mere pretense, and would have been wholly insufficient to protect it and its receipt holders against a judgment creditor of, or *bona fide* purchaser from T. W. Hall & Co., the action taken by it on that day was sufficient (so far as the wool covered by its receipts was concerned) to make its title complete against the assignors, assignee and general creditors to the extent of the advances of its receipt holders, which remain unpaid.   The argument that the receipt holders have no better footing in the case than the storage company, and that it can have no rights because the evidence shows that its arrangements with Hall & Co. were intended by both parties to procure for the firm a credit from others which would not have been extended if their relations were made known, is not sound.   The receipt holders are free from fault, whatever may be said of the storage company.   They advanced their money on the receipts in good faith, having no reason to believe that any such intention existed as is charged, or that the possession of the storage company would be so evanescent that their investments would be in constant danger.   Why should they be visited with a penalty, which, if inflicted at all, should be borne only by the transgressors?   It is true that appellant's success in this case is a measure of indirect benefit to the storage company.   But whatever infirmities may be charged to the law, it never consents to the punishment of the innocent for fear the guilty may flourish.

The proceeds of all the wool on the second and third floors, except what was directed to be paid to Patterson Brothers, Lieneman & Schmidt, Grande Brothers and Parberry and Kertz, should be awarded to the storage company for use of its receipt holders, deducting the expenses as hereinafter directed.

The evidence shows to our satisfaction that Patterson Brothers' wool, to the extent of the proceeds of sale were awarded to them by the decree, was in the warehouse of Hall & Co. at the time of the assignment, and was distinguishable from all other wool there.  That is also tacitly conceded by appellants to be the case with the wool found by the decree to belong to Lieneman & Schmidt; and it sufficiently appears that, although Grande Brothers' wool was lost sight of, other wool was substituted for, and received by Hall & Co. in place of it.  The shipments by Parberry and Kertz consisted of Montana wool.  After it was received in the warehouse, each of their shipments was graded, and that belonging to each grade was mixed with other wool of the same grade; but no account appears to have been kept of the quantity of any grade belonging to either shipper, nor does the evidence disclose how much of any one grade was received from either Parberry or Kertz.  There was some evidence of a custom authorizing the factor to mix consignments of the same grade from his several customers, but the custom testified to, falls far short of permitting the disposition made of the Parberry and Kertz wool without taking any precaution to ascertain the quantity in each grade.  It would seem, therefore, clear, that Hall & Co. were guilty of confusion when they thus obliterated all traces of the property of these two consignors.  Against these wrongdoers, certainly there should be an effectual remedy, and we think that applied by the court in allowing the owners of the wool less than the average proceeds of those grades of wool was none too liberal.  The doctrine of confusion is intended to make the wronged party whole beyond all doubt, and had the decree found Parberry and Kertz entitled to the proceeds of every pound of wool out of the best grade with which it was mixed, there might be serious difficulty in disputing the propriety of the finding.   2 Schouler on Personal Property, Secs. 43, 47, 48.  Appellants were not absolute purchasers, but merely lien holders or pledgees, and so they have no better standing against these consignors than the factors, Hall & Co., would have.   Jones on Pledges, Secs. 328, 329, 331.  The decree in favor of Patterson Brothers,

The claims of Vehmeyer and the Lincoln National Bank were correctly disposed of. They were based on what purported to be warehouse receipts issued by T. W. Hall & Co. That firm was never in the business of warehousing, although they had for several years issued what were in form warehouse receipts of their own property stored in their own warehouse. That course of business does not make what is known as a warehouseman, nor does a receipt of that character furnish any greater protection to the holder than an unacknowledged chattel mortgage.

No attorney's fee should be deducted from the share of appellants in the proceeds of the wool. The attorney's fee should be paid by the assignee from the general fund, except so far as the direction to pay from the shares of the several parties having priorities was consented to or not complained of. So far as the other charges and expenses are concerned, the decree is approved.

Patterson Brothers, Lieneman & Schmidt, Grande Brothers, Parberry and Kertz will recover their costs in this court against appellants. Vehmeyer and the Lincoln National Bank will be charged with their own costs, and appellants will recover one-third of their costs from the Union Trust Company. We think no error is disclosed by the record aside from those pointed out herein.

The decree is reversed and the cause remanded with directions to the County Court to enter a decree in conformity with this opinion.

*Reversed and remanded with directions.*